UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

ROBERT W.[1],                          )
                                       )
          Plaintiff,                   )
                                       )
     v.                                )     CIVIL NO.  2:20cv296
                                       )
ANDREW SAUL,                           )
Commissioner of Social Security,       )
                                       )
          Defendant.                   )

<u>OPINION AND ORDER</u>

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application seeking a period of

disability and Disability Insurance Benefits (DIB) as provided for in the Social Security Act. 42

U.S.C. § 423(a), § 1382c(a)(3).  Section 405(g) of the Act provides, inter alia, "[a]s part of his

answer, the [Commissioner] shall file a certified copy of the transcript of the record including the

evidence upon which the findings and decision complained of are based.  The court shall have the

power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying,

or reversing the decision of the [Commissioner], with or without remanding the case for a

rehearing."  It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by

substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

     The law provides that an applicant for disability insurance benefits must establish an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to last for a continuous period of not less

than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental

---

[1]  To protect privacy, Plaintiff's full name will not be used in this Order.

impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings. *Scott v. Astrue*, 734, 739 (7th Cir. 2011); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see also Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2.     The claimant has not engaged in substantial gainful activity since April 1, 2017, the alleged onset date (20 CFR 404.1571 et seq.).

3.     The claimant has the following severe impairments: prostate cancer, emphysema, glaucoma, status-post surgery for primary open angle glaucoma of the left eye, and obesity (20 CFR 404.1520(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567 (c) except: frequently climb ramps and stairs; never climb ladders, ropes, and scaffolds; frequently balance, stoop, kneel, crouch and crawl. He is capable of avoiding ordinary hazards in the workplace, such as boxes on the floor, doors ajar, approaching people or vehicles; can work with small objects such as those involved with sedentary work; can work with large objects; and no commercial driving (20 CFR 404.1567(c)).

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on October 2, 1959 and was 56 years old, which is defined as an individual of advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2017, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 27-34).

3

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review.  This appeal followed.

Plaintiff filed his opening brief on May 14, 2021.  On June 25, 2021, the defendant filed a memorandum in support of the Commissioner's decision, to which Plaintiff replied on July 30, 2021. Upon full review of the record in this cause, this court is of the view that the ALJ's decision must be affirmed.

A five-step test has been established to determine whether a claimant is disabled.  *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987).  The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order:  (1)  Is the claimant presently unemployed?  (2)  Is the claimant's impairment "severe"?  (3)  Does the impairment meet or exceed one of a list of specific impairments?  (4)  Is the claimant unable to perform his or her former occupation?  (5)  Is the claimant unable to perform any other work within the economy?  An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).  From the nature of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

Plaintiff was born on October 2, 1959. (Tr. 62) At the time of his filing date, he was 56 years old. *Id*. Plaintiff has received a high school diploma. (Tr. 172) He has past relevant work

experience as a driver, construction worker, maintenance worker, and industrial worker. (Tr. 173)

On February 20, 2017, Plaintiff presented to Dr. Samuel Lemon of North Shore Health Centers for a routine eye exam. (Tr. 226) Prior to presenting to Dr. Lemon, Plaintiff was previously being treated for glaucoma with Combigan by Dr. Taglia. *Id*. At this appointment, Dr. Lemon diagnosed Plaintiff with bilateral hyperopia and severe stage open angle glaucoma of both eyes and prescribed him Combigan. *Id*. On March 20, 2017, Plaintiff presented to Dr. Lemon for a pressure check and visual field test. (Tr. 228) Dr. Lemon recommended he be referred to Dr. Williams for glaucoma treatment when Plaintiff's insurance became available. *Id*. On May 25, 2017, Plaintiff presented to Dr. Lemon for a pressure check and visual field test. (Tr. 230) At this appointment, Plaintiff was referred to Dr. Williams for glaucoma treatment and scheduled for a repeat visual field test in six months. *Id*.

On July 5, 2017, Plaintiff presented for CT pelvic and scrotal imaging scans. (Tr. 559) On July 18, 2017, Plaintiff presented to Dr. Peng, his urologist, regarding the growth inside his scrotum (Tr. 561) At this appointment, Plaintiff complained of growth and discomfort in his scrotum. *Id*. Plaintiff explained that onset of the growth was sudden. *Id*. Dr. Peng described the mass as being of medium size and requested to see Plaintiff again in three months. (Tr. 561, 563) On July 28, 2017, Plaintiff presented to Dr. Kevin Strohl of North Shore Health Centers for a wellness visit and Plaintiff needed a referral to an ophthalmologist due to the previous referral not being from his primary care provider. (Tr. 232) At this appointment, Plaintiff was referred to the ophthalmologist for further evaluation and treatment of his glaucoma. (Tr. 236) Plaintiff was also referred for a colonoscopy. *Id*. On August 14, 2017, Plaintiff presented to Dr. Fernando Rivera for follow up on the results of his wellness visit. (Tr. 239) At this visit, Plaintiff was diagnosed with

pure hyperglyceridemia and obesity. (R. at 241) Plaintiff was advised to maintain a low fat, low cholesterol diet. *Id.*

On October 4, 2017, Plaintiff presented to Dr. Williams of the Williams Eye Institute for evaluation and treatment of his eye conditions. (Tr. 253) Plaintiff complained of glare when driving at night and sometimes sees a blurred area in vision. (Tr. 254) At this appointment, Plaintiff was diagnosed with mild cataracts and moderate controlled glaucoma. *Id.* The physician noted that Plaintiff had a thinning of the nerve fiber layer. (Tr. 255) Dr. Williams commented that Plaintiff's glaucoma was greater in the left eye than the right. (Tr. 256)

On October 12, 2017, Plaintiff presented to Dr. Peng regarding his scrotal mass. (Tr. 564) Plaintiff complained of increased urgency and frequency of urinating. *Id.* Plaintiff's prostate-specific antigen was at 3.9. (Tr. 567) At this appointment, Dr. Peng's assessment was that the scrotal mass was a benign prostatic hyperplasia and ordered a blood draw and follow-up visit in six months. (Tr. 566)

On November 28, 2017, Plaintiff presented to Dr. Rivera for a follow-up to hyperglyceridemia and health maintenance. (Tr. 279) Dr. Rivera refilled Plaintiff's prescription of fenofibrate for his hyperglyceridemia. (R. at 282)

On March 6, 2018, Plaintiff presented to Dr. Peng regarding his enlarged prostate. (Tr. 571) At this appointment, Plaintiff's prostate-specific antigen was 4.7. *Id.*  On March 15, 2018, Plaintiff presented to Dr. Peng regarding his ongoing prostate issues. (Tr. 574) Dr. Peng's assessment was that Plaintiff had elevated prostate-specific antigens and recommended surgery. (Tr. 576)

On March 15, 2018, Plaintiff presented to Dr. Arshia Mohiuddin for hyperlipidemia and

6

Health Maintenance. (Tr. 284) At this visit, Dr. Mohiuddin recommended Plaintiff for a colon cancer screening. (Tr. 288)

On March 19, 2018, Plaintiff presented to Dr. Peng for an ultrasound and biopsy of the prostate. (Tr. 577) The procedure was performed without complication. *Id*. On March 29, 2018, Plaintiff presented to Dr. Peng regarding his prostate issues. (Tr. 588) Plaintiff had increased urgency and frequency of urination, nocturia, and post-void dribbling. *Id*. Dr. Peng diagnosed Plaintiff's cancer as intermediate with a Gleason score of 7. (Tr. 585)

On April 4, 2018, Plaintiff presented to Dr. Henedina Macabalitaw for a follow-up of his lab results. (Tr. 289) At this appointment, Plaintiff told Dr. Macabalitaw that his urologist, Dr. Peng, told him he has prostate cancer and that he may get radiation treatment. (Tr. 292) On April 10, 2018, Plaintiff presented to Dr. Rivera. (Tr. 294) Dr. Rivera diagnosed Plaintiff with malignant neoplasm of the prostate. (Tr. 297) Dr. Rivera recommended Plaintiff continue to see his urologist for treatment of his prostate cancer. *Id*. On April 20, 2018, Plaintiff presented to Dr. Yameen Rashid with a recent diagnosis of prostate cancer. (Tr. 338) He was referred from Dr. Peng. *Id*. Dr. Rashid reviewed the pathology report with Plaintiff. *Id*. They were to follow up with radiation oncology and follow-up bone scan and CT. *Id*. Plaintiff showed prostate adenocarcinoma in the right lateral base with Gleason score of 7. *Id*.

On June 14, 2018, Plaintiff presented for another eye exam at Williams Eye Institute. (Tr. 259) Plaintiff stated that his visual acuity had gotten much worse in his left eye. *Id*. At this visit, Plaintiff was diagnosed with mild age-related macular degeneration and his glaucoma was changed from moderate to advanced. *Id*. He was advised to start taking AREDS 2, an eye vitamin. *Id*. At this appointment, the physician also noted that there was a marked thinning of the nerve fiber

layer. (Tr. 261) On June 28, 2018, Plaintiff presented to Dr. Mohiuddin regarding his glaucoma. (Tr. 299) Plaintiff requested a referral to an eye doctor. (Tr. 302) Dr. Mohiuddin referred Plaintiff and refilled his hyperlipidemia medication. *Id*.

On June 29, 2018, presented to Dr. Rashid regarding his prostate adenocarcinoma. (Tr. 371) Plaintiff was diagnosed with lung nodules measuring 7x4mm and 8x4 mm and referred to a pulmonologist. (Tr. 371-372)

On August 29, 2018, Plaintiff presented to Dr. Don H. Dumont for evaluation of pulmonary nodules. (Tr. 474) Dr. Dumont stated that Plaintiff has shortness of breath with even relatively mild exertion. *Id*. A chest CT revealed that Plaintiff has pulmonary micro nodules in both lungs that are contained within fissures. *Id*. There is a minor fissure on the right and a major fissure on the left. *Id*. At this appointment, Plaintiff was diagnosed with mucopurulent chronic bronchitis and scheduled for a follow up scan in six months. *Id*.

On August 23, 2018, Plaintiff presented to Dr. Peng for a prostate cancer follow-up. (Tr. 594) At this appointment, Dr. Peng observed that Plaintiff's Gleason score had gone from 7 to 6 indicating that radiation treatment was having some effect. *Id*.

On September 13, 2018, Plaintiff presented for another eye exam at Williams Eye Institute. (Tr. 258) Plaintiff claimed that his left eye visual acuity was continuing to deteriorate and that he was having occasional stabbing pain. *Id*. The examining physician found that Plaintiff's intraocular pressure was too high. *Id*. He prescribed Plaintiff Lumigan to reduce eye pressure and referred Plaintiff to Dr. Wang for further evaluation and treatment. (Tr. 258)

On September 26, 2018, Plaintiff presented to Dr. Rashid following the completion of his radiation in July 2018. (Tr. 399) Plaintiff did not report any lingering issues stemming from his

radiation treatment. *Id*.

On November 12, 2018, Plaintiff presented to Dr. Aditya Shah for leg wound that had failed to heal. (Tr. 304) Dr. Shah diagnosed Plaintiff with cellulitis of the right lower extremity. (Tr. 307) Plaintiff was prescribed clindamycin and advised on wound care. *Id*.

On December 3, 2018, Plaintiff presented to Dr. Wang of Helix Eye Care for consultation visit for his glaucoma. (R. at 465) Plaintiff stated that he was having problems with shadows in his left eye and at night he sees spider webs. *Id*. Dr. Wang diagnosed Plaintiff's primary open angle glaucoma as moderate in his right eye and severe in his left. (Tr. 467) Dr. Wang also stated that Plaintiff had moderate age-related macular degeneration in both eyes. *Id*. Plaintiff complained of eye pain, glaucoma, cataracts, macular degeneration, floaters, ear ringing, and shortness of breath. (Tr. 465)

On December 20, 2018, Plaintiff visited Sandra Aloia, a pulmonary respiratory therapist with Franciscan Alliance, regarding his chronic bronchitis. (Tr. 500) At this appointment, Plaintiff was treated with a nebulizer treatment. He tolerated treatment with no problems. *Id*.

On December 26, 2018, Plaintiff  presented to Dr. Rashid for a follow-up visit. (Tr. 421) At this appointment, Dr. Rashid stated that Plaintiff was tolerating radiation therapy well and that there was no clinical evidence of recurrence. (Tr. 424) Dr. Rashid also mentioned that Plaintiff's CT scan seemed to show stable lung nodules. *Id*.

On December 27, 2018, Plaintiff presented to Dr. Anoop Appannagari for a colonoscopy. (Tr. 521)

On December 31, 2018, Plaintiff presented to Dr. Wang for treatment of his eye problems. (Tr. 462) Plaintiff stated that his vision in his left eye might be getting worse. *Id*. Dr. Wang

scheduled a trabeculectomy to try to help stem Plaintiff's vision loss in his left eye. (Tr. 463)

On January 14, 2019, Plaintiff presented to Dr. Wang. (Tr. 268) Dr. Wang performed a left eye trabeculectomy with mitmycin C to treat Plaintiff's primary open angle glaucoma. (Tr. 275) The surgery did not have any complications and Plaintiff tolerated the operation well. *Id*. On January 15, 2019, Plaintiff presented to Dr. Wang for a post-surgical visit. (Tr. 459) Dr. Wang stated that the surgery had gone well and while Plaintiff's intraocular pressure was a little high it was not concerning. *Id*. On January 25, 2019, Plaintiff presented to Dr. Wang for a post-operative visit where he got his first stitch cut. (Tr. 456) On February 1, 2019, Plaintiff presented to Dr. Wang for a follow up regarding his eye surgery. (Tr. 453) At this appointment, Dr. Wang cut the second stitch of Plaintiff's eye. *Id*.

On February 4, 2019, Plaintiff presented again to Dr. Dumont for the results of his CT chest scans and recommendations. (Tr. 539) At this appointment, Dr. Dumont commented that the CT results showed no change in Plaintiff's pulmonary nodules but he encouraged Plaintiff to stop smoking. (Tr. 541)

On February 14, 2019, Plaintiff presented to Dr. Rivera for a follow-up regarding his hyperlipidemia. (Tr. 309) At this appointment, Plaintiff was started on Nicoderm CQ patches for smoking. (Tr. 312) Dr. Rivera also refilled Plaintiff's medication regarding his hyper-cholesterolemia. *Id*.

On February 15, 2019, Plaintiff presented to Dr. Shah for a complete physical examination. (Tr. 314) At this appointment, Plaintiff complained of pressure on his left eye due to recent glaucoma surgery. *Id*. Plaintiff was using eye drops and cholesterol medication. *Id*.

On February 28, 2019, Dr. Wang completed a visual residual functional capacity

questionnaire regarding Plaintiff's vision. (Tr. 328) He diagnosed Plaintiff with primary angle glaucoma, cataracts, and dry macular degeneration. *Id*. He stated that Plaintiff vision should recover in a few months to pre-surgery levels, but will not be better than before the surgery. *Id*. He also stated that Plaintiff had severe constriction in the left eye and minimal constriction in the right eye. *Id*. Plaintiff has blurred vision and severe constriction in peripheral vision in the left eye. *Id*. Dr. Wang opined Plaintiff could tolerate occasional depth perception and frequent near and far acuity in both eyes. *Id*.

On March 4, 2019, Plaintiff presented to Dr. Wang for a follow-up after his eye surgery. (Tr. 447) Plaintiff stated that his eyes are slightly better. *Id*. Plaintiff indicated that he was still experiencing eye pain, glaucoma, cataracts, macular degeneration, floaters, ringing in his ears, and shortness of breath. *Id*. At this visit, Dr. Wang diagnosed that Plaintiff's cataracts were moderate in both eyes. (Tr. 448) On March 27, 2019, Plaintiff presented to Dr. Wang again for a post-op visit regarding his eye surgery. (Tr. 444) Plaintiff stated that his pain, discomfort, and redness had largely subsided from the surgery. However, he stated he still experiences mild irritation. *Id*. Dr. Wang also stated that the left eye was healing well following the surgery and Plaintiff's intraocular pressure was excellent after all sutures were taken out *Id*.

In support of remand, Plaintiff argues that the ALJ erred in her assessment of Plaintiff's RFC. The residual functional capacity (RFC) is the most a claimant can do despite his limitations. 20 C.F.R. § 404.1545(a). At the hearing level, the ALJ has the responsibility to assess the RFC and decide whether a claimant is disabled. 20 C.F.R. § 404.1546(c). In determining the RFC, an ALJ makes an administrative assessment of a claimant's ability to perform work-related activities on a regular and continuing basis. Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *2

(S.S.A.). An ALJ assesses a claimant's RFC based on all of the relevant evidence in the claim file at the time he or she makes a decision, including the objective medical evidence, medical source opinions and observations, and a claimant's own statements about his limitations. *Id*. Although the ALJ is responsible for assessing a claimant's RFC, the claimant has the burden of showing how his impairments limit his functioning. *See* 20 C.F.R. § 404.1512(a)(1); *see also Abbett v. Berryhill*, No. 1:17-CV-232-TLS, 2018 WL 3018967, at *5 (N.D. Ind. June 18, 2018) (holding that the plaintiff has the "burden to come forward with evidence of her limitations.").

 Plaintiff challenges the ALJ's consideration of evidence pertaining to his pulmonary and vision impairments. In particular, he argues that the ALJ erred when the ALJ assessed Plaintiff's RFC "without considering an expert opinion of any doctor who ever saw complex imaging and clinical evidence" concerning those impairments.

However, as the Commissioner notes, neither the Social Security Act nor the regulations requires there to be a medical source statement in the file before an ALJ can make a decision. An ALJ is entitled to assess medical evidence even without the aid of a State agency medical consultant or medical expert. *See Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) ("[T]he determination of a claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide.") (citation and internal quotation omitted); *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) ("the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians.") (citations omitted); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

At step two of the sequential evaluation process, the ALJ found emphysema to be a severe impairment (Tr. 27) During the RFC narrative discussion, the ALJ discussed Plaintiff's September

2018 CT imaging of his chest, which affirmed a mild presence of emphysematous changes in both

lungs (Tr. 31, 402). Plaintiff argues that his case should be remanded because "no medical doctor

ever reviewed [his] complex imaging reports and opined on reasonable functional limitations

which may have resulted from the etiology". Notably, however, Plaintiff's own pulmonary expert

assessed his clinical condition and reviewed diagnostic tests.

As the record demonstrates, in August 2018, Plaintiff reported to pulmonologist Don H.

Dumont, M.D., that he had been a cigarette smoker for 40 years, smoking approximately 1 ½

packs per day (Tr. 474). Plaintiff told Dr. Dumont that he had shortness of breath with even

relatively mild exertion and he stated that he had a history of chronic bronchitis (Tr. 474, 476). On

examination, Dr. Dumont noted that Plaintiff had diminished air exchange through his lungs and

few coarse rhonchi in the upper anterior chest (Tr. 476). But Dr. Dumont did not assess any

particular work-related functional limitations or indicate that Plaintiff could not work due to a

pulmonary impairment (Tr. 32, 476). Dr. Dumont reviewed Plaintiff's CT scan (Tr. 476). He

determined that the pulmonary lung nodules viewed on the scan were "likely benign and may

represent trapped fluid or old granulomatous reaction," but he doubted that there was a

"malignant etiology" (Tr. 476). Dr. Dumont recommended that Plaintiff have a pulmonary

function test (PFT) and a follow-up CT scan (Tr. 476).

A December 2018 PFT report indicated that Plaintiff had mucopurulent chronic bronchitis

and "demonstrates a restrict defect of mild degree" (Tr. 508, 510, 541). Plaintiff underwent a

repeat CT scan in December 2018, which, according to Dr. Dumont's treatment note, showed

"flat pulmonary micronodules in both lungs both subcentimeter in size and each contained within

fissures, minor fissure on the right and major fissure on the left" (Tr. 541).  Dr. Dumont compared

the results with the April 2018 study and noted that the diagnostic findings were "unchanged over the interval" (Tr. 541). Dr. Dumont's February 2019 treatment note shows that he did not recommend any treatment, nor did he prescribe any medication (Tr. 541). But he "urged" Plaintiff to stop smoking and recommended that Plaintiff return in about 10 months (Tr. 541, 545).

Plaintiff asserts that the ALJ's RFC for a range of medium work is inconsistent with "[his] doctor's observation he became short of breath even with 'mild exertion'". It should be noted, however, that Dr. Dumont's comment in this regard is based on what Plaintiff told him, as indicated under the "HPI" (Plaintiff's reported history) on the August 2018 treatment note (Tr. 474). Dr. Dumont's mere recitation of Plaintiff's report does not amount to a medical opinion. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). Additionally, a claimant's statements are not conclusive evidence of disability and are insufficient to establish functional limitations. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability…"); 20 C.F.R. § 404.1529(a) ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled"). Here, the ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record (Tr. 31).

Moreover, other substantial evidence of record supports the ALJ's decision not to include additional RFC limitations. For example, numerous treatment records document normal respiratory findings *(see, e.g.*, Tr. 235, 282, 287, 297, 302, 307, 312, 371, 423). Additionally, Plaintiff's January 2019 chest x-ray identified no acute cardiopulmonary abnormalities (Tr. 272).

Plaintiff has not pointed to any medical evidence showing that his pulmonary impairment caused any specific work-related functional limitations. *See Gedatus v. Saul*, 994 F.3d 893, 905

(7th Cir. Apr. 23, 2021) ("[S]he has not pointed to any medical opinion or evidence to show any tremors caused any specific limitations."); *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) ("[E]ven if the ALJ's RFC assessment were flawed, any error was harmless" because "[i]t is unclear what kinds of work restrictions might address [claimant's] limitations … because he hypothesizes none" and "the medical record does not support any")).

The cases Plaintiff cites are distinguishable from the present case. For example, in *McHenry v. Berryhill*, 911 F.3d 866, 870-71 (7th Cir. 2018), the ALJ found, without any medical expert assistance, that an MRI was not consistent with the relevant medical record and gave it no weight. The Court stated that an ALJ "may not conclude, without medical input, that a claimant's most recent MRI results are 'consistent' with the ALJ's conclusions." *Id*. at 871. Similarly, in *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014), the ALJ uncritically relied on the opinion of State agency medical consultants who had not seen a later MRI, even though the exact reason one of the second consultants rejected the claimant's allegations of a worsening condition was the lack of new supporting medical evidence in the file. The Court found that the MRI was "new and potentially decisive medical evidence" that should have been submitted to medical scrutiny. *Id*. In *Akin v. Berryhill*, 887 F.3d 314, 317 (7th Cir. 2018), the ALJ interpreted an MRI report as being "consistent" with his RFC assessment, which the Court found exceeded the ALJ's qualifications since the MRI might have corroborated the plaintiff's complaints or might have supported the ALJ's interpretation, but the ALJ needed an expert opinion.

Here, unlike the above cases, Dr. Dumont interpreted the PFT and compared the CT scans, but he did not indicate that Plaintiff had any functional limitations. Thus the ALJ did not improperly "interpret" Plaintiff's CT scan or conclude that an imaging study was consistent with

15

her assessed RFC. The ALJ simply re-stated information from the medical records (Tr. 31, 402). This was not an error.

Likewise, Plaintiff's reliance on *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018), is misplaced. In *Moreno*, the ALJ relied on the opinion of the State agency psychological consultant when later evidence could have changed the reviewing physician's opinion. *Id*. Here, the ALJ found the State agency medical consultants only somewhat persuasive, but the ALJ's RFC finding provided greater limitations based on a consideration of the combination of impairments and based on other later-submitted evidence (Tr. 32). *See* 20 C.F.R. § 404.1520c (discussing how the Agency considers medical opinions and prior administrative medical findings for cases filed after March 27, 2017). Here, the ALJ did not impermissibly interpret evidence or "play doctor," as Plaintiff suggests. Rather, the ALJ appropriately discussed the evidence related to the relevant time period and assessed an RFC supported by that evidence.

Plaintiff also argues that the ALJ erred in considering evidence concerning his visual impairment, and that the ALJ did "not seem[] to grasp" [the] worsening" of his condition. However, as the ALJ discussed, North Shore records from February 2017 discuss Plaintiff's complaints of eye pressure and diagnosis of hyperopia glaucoma in both eyes (Tr. 30, 226-27). Samuel Lemon, O.D., recommended new prescription glasses and continued Plaintiff's prescription for eye drops (Tr. 226-27).

In late-July 2017, the Plaintiff underwent a number of blood tests, and was referred by Kevin Strohl, M.D., to an ophthalmologist for an eye exam (Tr. 30, 236). Dr. Strohl's physical assessment of Plaintiff does not note any vision or visual acuity signs or symptoms (Tr. 30, 235).

In mid-August 2017, Plaintiff returned for the results of his blood work (Tr. 30, 239).

Fernando Rivera, M.D., discussed Plaintiff's need to quit smoking, begin exercising more, and cut down on caffeine, but he noted no signs of abnormality (Tr. 30, 241-43).

In early October 2017, ophthalmologist Ann Williams, M.D., evaluated Plaintiff's vision complaints (Tr. 30, 254). Dr. Williams noted that Plaintiff's overall visual acuity was 20/40, but with restricted left field, and dense loss of visual field/central island (Tr. 30, 254). Dr. Williams categorized Plaintiff's cataracts as mild and his glaucoma was moderate, but controlled (Tr. 30, 254). She continued Plaintiff on prescribed eye drops, but indicated no further treatment or preventative measures at that time (Tr. 30, 254).

In a letter dated November 6, 2017, Dr. Williams indicated that Plaintiff was last examined on October 4th and his best corrected visual acuity was 20/30 in each eye (Tr. Tr. 31, 252). Dr. Williams opined that Plaintiff "may do work related activities that require a visual acuity of 20/30" (Tr. 31, 252). The ALJ found this recommendation to be "very persuasive, given this is Plaintiff's retained visual acuity level" (Tr. 31, 252). *See* 20 C.F.R. § 404.1520c.

Plaintiff contends that the ALJ assessed the RFC based on a mis-impression of Plaintiff's retained visual acuity as identified by Dr. Williams in November 2017. But, as the decision demonstrates, the ALJ did not base the RFC finding on "inaccurate medical judgment" concerning Dr. Williams's statement. Dr. Williams's report on Plaintiff's condition as of November 2017 was but one piece of evidence the ALJ considered concerning Plaintiff's vision impairment (Tr. 30-31). Rather, the ALJ recognized other evidence indicated restricted visual fields and that Plaintiff required further treatment, including eye surgery (Tr. 31-32).

When assessing the RFC, the ALJ also considered the opinions of the State agency medical consultants who reviewed Plaintiff's records at the initial and reconsideration levels of

administrative review (Tr. 32). In November 2017, Jerry Smartt, Jr., M.D., reviewed the record and found that the medical evidence did not support any severe physical impairments (Tr. 64). On reconsideration, in late-December 2017, J.V. Corcoran, M.D., affirmed Dr. Smartt's determination (Tr. 71). The ALJ found the medical consultants' opinions be only "somewhat persuasive" (Tr. 32). The ALJ explained that greater RFC limitations were warranted based on Plaintiff's combined impairments and newer evidence in the record submitted at the hearing level (Tr. 32).

The ALJ considered subsequent records from Plaintiff's primary care providers at North Shore, which continued to show a history of glaucoma, but with no mention of abnormal eye findings (Tr. 30, 279, 282, 284, 287, 289, 294, 297, 304, 307, 309, 312, 314, 317).

The ALJ also considered additional records from Dr. Williams. Plaintiff followed-up with Dr. Williams in June 2018 (Tr. 259). He reported a decrease in visual acuity, worse in the left eye, and a glare while driving (Tr. 259). Dr. Williams's exam indicated left eye visual field loss with peripheral loss of vision, caused by the glaucoma development (Tr. 31, 259-62). In September 2018, Dr. Williams referred Plaintiff to ophthalmologist Leo K. Wang, M.D., for further evaluation and treatment (Tr. 258).

Thereafter, Plaintiff continued over-the-counter treatment and monitoring, but he eventually underwent surgical correction of the glaucoma on his left eye, performed by Dr. Wang in January 2019 (Tr. 31, 268, 274-76). He was cleared physically for the surgery, and successfully returned home that same day, with very positive outlook according to the follow up notes (Tr. 31, 268-74). There were some lingering symptoms of pressure on the left eye as of February 2019, but the ALJ remarked that these were not nearly as intense or restrictive as before the correction (Tr. 31, 314).

18

In assessing the RFC, the ALJ also considered Dr. Wang's opinion contained within a "Vision Residual Functional Capacity Questionnaire" (Tr. 31, 328-29). As Plaintiff correctly notes, Dr. Wang's form indicates that Plaintiff had blurred vision and severe constriction in peripheral vision in the left eye, but minimal constriction in the right eye (Tr. 328). Notwithstanding Plaintiff's vision difficulties, Dr. Wang responded to various work-related questions as follows:

> • Is your patient capable of avoiding ordinary hazards in the workplace, such as boxes on the floor, doors ajar, approaching people or vehicles?  Answer: Yes
> • Does your patient have any difficulty walking up or down stairs? Answer: No
> • Can your patient work with small objects such as those involved with sedentary work? Answer: Yes
> • Can your patient work with large objects? Answer: Yes.

(Tr. 31, 329). The ALJ was greatly persuaded by the opinions of Dr. Wang, Plaintiff's treating specialist, and his opinions are supported by medical records and Plaintiff's own admissions (Tr. 32). 20 C.F.R. § 404.1520c(c). The ALJ found that Dr. Wang's opinions allow for Plaintiff to perform work within the parameters of the assessed RFC (Tr. 25, 31). Dr. Wang's opinions thus provide substantial evidence in support of the ALJ's RFC finding.

During the administrative hearing, the ALJ acknowledged Plaintiff's visual limitations, consistent with Dr. Wang's opinion (Tr. 56). The ALJ asked the vocational expert whether work existed in the national economy for a hypothetical individual with Plaintiff's vocational factors (i.e., age, education, and work history) and RFC for medium work, except he could only frequently climb ramps and stairs; never climb ladders, ropes, and scaffolds; frequently balance, stoop, kneel, crouch, and crawl; he is capable of avoiding ordinary hazards in the work place such as marks on the floor, doors ajar, approaching people or vehicles; he can work with small objects, such as those involved with sedentary work; and he can work with large objects (Tr. 56). The

19

vocational expert identified representative occupations (room attendant, laundry worker I, and press tender) that such a hypothetical individual could do (Tr. 56-57).8 The ALJ appropriately relied on the vocational expert's testimony when finding Plaintiff not disabled under the Act (Tr. 33).

Plaintiff argues that the ALJ should have submitted evidence of his vision impairment to an "ophthalmological expert" who "might have concluded" that Plaintiff could not perform the vocational expert's representative jobs given the "worsening of his visual acuity". However, an ALJ does not rely on a medical expert to testify on what jobs a claimant can or cannot do. Rather, an ALJ may call a vocational expert to address complex aspects of the employment determination, including statements about what a job may require or the availability of given positions in the national economy. SSR 00-4p, 2000 WL 1898704, at *2 (S.S.A.); 20 C.F.R. § 404.1566(e).

Here, the ALJ's decision explains that no treating or examining doctor assigned medical restrictions or functional limitations that would preclude employment (Tr. 32). As discussed above, the ALJ appropriately found the February 2019 opinion of Plaintiff's own ophthalmologist (Dr. Wang) to be persuasive (Tr. 31-32). Dr. Wang's opinion on Plaintiff's functional limitations provides support for the RFC finding (Tr. 29, 31-32). Dr. Wang's opinion contains the visual acuity findings that Plaintiff wants to have submitted to another ophthalmologist for an opinion (Tr. 328). Plaintiff speculates on what another ophthalmologist may have opined, but the record was adequate for the ALJ to make a decision. 20 C.F.R. § 404.1520b.

In any event, Plaintiff has the burden of proving disability and producing evidence. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1512(a); *Flener ex. rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004). If, as Plaintiff speculates, his vision impairment precluded his ability to

perform a reduced range of medium work, it was for Plaintiff to "explain why [he] was disabled" due to these impairments, which he failed to do. *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013). Also, because Plaintiff does not specify what additional RFC restriction(s) he required, based on the medical evidence, "[i]t is unclear what kinds of work restrictions might address [his] limitations . . . " *Jozefyk*, 923 F.3d at 498.

Accordingly, as substantial evidence supports the ALJ's decision and there is no basis for remand, the decision will be affirmed.

<u>Conclusion</u>

On the basis of the foregoing, the decision of the Commissioner is hereby AFFIRMED.

Entered: August 9, 2021.

s/ William C.  Lee
William C. Lee, Judge
United States District Court